I was just telling you to hang on a second and let them kind of get out. All right, you're good, you can come on up. I just wanted to say it was a large group of them to let them get on out. All right, sir, you may proceed. Thank you, Your Honor. I appreciate you allowing us to be able to make our argument in this case. I think this gives the opportunity for this court to make determinations in this circuit related to issues of what is proper notice on behalf of the company whenever a harassment complaint is made or occurs in front of managers and supervisors, as well as the ultimate determination on what's the minimum standard a company has to reach in order to be able to get the ELA paragraph affirmative defense. In this particular case, my client essentially worked for a pizza hut in San Antonio. He was mostly a driver, sometimes was a cook, sometimes did some other type of work related to just low, menial type work at that pizza hut. This particular pizza hut was essentially a separate entity. There's 32 different pizza huts that are owned by this conglomeration, but each one of those entities were separate in and of themselves. Now, when you say separate, we're talking about pizza hut number six in San Antonio. Was it a separate corporation? Yes, Your Honor. It was a separate corporation in the documents itself, and the head person of that particular location was the general manager, and he was in charge. My question is, was it a corporation? Yes, Your Honor. Number six. Yes, Your Honor, it was. Freestanding separate corporation. Yes, they had a separate corporate entity. Now, did they use some facilities from a pizza hut as far as using maybe some HR functions and other things like that? Yes, they did, but it was a separate entity in and of itself. In fact, the defendants in this particular case argued initially that they shouldn't even have an integrated enterprise issue related to this particular thing initially related to this particular matter. Did a separate corporation have separate shareholders? You know, each one of the corporations had a different conglomeration of ownership between the Richmond family owns all these pizza huts, and so three brothers may own this pizza hut, three may own another, and it was kind of a different. But it was a separate corporation? Yes, Your Honor. And this was the number six was the party that was brought in approximately a week before trial. Is that correct? The entity that was the actual name, we have the issues related to the name, and we made sure we got the exact name right before trial. And as I understand it, throughout the litigation, counsel for defendants had advised you had not yet sued the correct party that the correct party would be pizza hut number six. No, Your Honor. They actually gave us different documentation saying it was a different type of name. We went and put that name in, and then at that particular point in time, we found out that there was different issues related to exactly who owned what and that there was some integration between them and the conglomeration as it relates to that. And when approximately a week before trial, the judge allowed you to bring in, among others, Judge Rodriguez allowed you to bring in, among others, new party pizza hut number six, he also said that since I am bringing them in at this time, they have the right to assert any and all defenses they want to assert. Well, we didn't really bring in a new entity. We essentially just made sure they had the proper name of the entity. Right, okay. But is that the first time pizza hut number six was named as a party? It was named in a different way. I think it said pizza hut San Antonio number six or something along those lines. Instead, it was changed to a different name than it was actually. And the Ellert-Faragher affirmative defense was raised for the first time. Yes, Your Honor. And did you at that time seek a continuance of the trial? No, Your Honor, we did not. And I'm assuming that if I had sought a continuance, maybe the court would have allowed it. But we did not seek a continuance of the trial. All right. Thank you. Anyway, my client essentially was an African-American male that worked at this particular facility. Again, this is a separate entity in and of itself. The head person that's in charge is the general manager. He started in early 2009. The general manager started about four or five months later. Her name is Lou Rosario. Ms. Rosario was essentially in charge of every aspect of that particular facility, hiring, firing, who gets what shift, who comes on board, the sexual profit center completely of that particular facility. There's no disputes that my client was racially and sexually harassed at that facility. And everyone at that facility knew that they were being sexually and racially harassed. And there's no doubt that that is the case. The assistant manager, Irma Aguilar, is one of the most important factors, I think, here. Ms. Aguilar testified at trial related to this particular matter that she witnessed the harassment, including comments about plaintiff's penis size, him being black in his issues related to penis size, that talking about whether or not he should eat chicken and watermelon, repeated comments about what type of sexual position he's in, all types of things along those lines. Ms. Aguilar testified at first she thought Ms. Rosario was joking, but she realized it was seriously not a joke after he noticed Mr. Blanton was not laughing or taking as a joke. She said she witnessed it on practically every shift Mr. Blanton worked, and he further stated that she would— There's no dispute that the jury found sexual harassment, correct? Yes, Your Honor. But the jury then found the affirmative defense precluded liability. Yes, Your Honor. So I wouldn't be taking up my valuable oral argument time talking about the harassment. The jury found that, and there's not a cross-appeal here. There's not a claim that there wasn't harassment. But my point is, Your Honor, that Ms. Aguilar saw the harassment that occurred in the workplace, knew it was going on in the workplace, and did not do anything about it. That's the point of our notice aspects of this particular case. If you—both Ms. Aguilar and specifically when Mr. Blanton complained to her about it, he told him specifically, she responded, that if you report it, I'm not going to report it on your behalf because I'm afraid I'm going to get fired, and if you report it— She wasn't the supervisor. She was. Ms. Aguilar was not Mr. Blanton's supervisor, was she? Yes, she was assistant manager of the facility. She was absolutely his supervisor. But the supervisor was the woman that was harassing him. No, the supervisor was the general manager, as the head person at the store. This person is the assistant manager at the store. And was Mr. Blanton's supervisor. Also, ship leader Ruiz also was his supervisor as well. She also witnessed the sexual harassment, and she also failed to report it. And both of these people told him when she came to him and said, how do I get this to stop, both of those people told him that we're not going to say anything because we're afraid we're going to get fired, and if you say something, you're probably going to get fired as well. But in connection with that, counsel, am I correct that everybody who, at least to this point, witnessed it or to whom he talked to about it, all those people were subordinate to Rosario. Is that right? Right. Rosario was the harasser. Right. And so while they may have known about it, they may have seen it, they were all subordinate to the woman who, Rosario, who was doing the harassing. She was everyone's supervisor to whom he spoke about it, at least at that point. That is correct. Is that right? That is correct. All right. But the issue is this court has already addressed some of those issues as it relates to this matter back in 1988 and 1999 as far as what is notice to the corporation of these particular matters. We don't have to go to it in the coworker context. But notice to this corporation, though, is notice in accordance with the policy which they disseminated to all their employees, didn't they? Well, that's one aspect of it. All right. Yes, the policy says specifically that you can do one or more of the following. You can complain directly to Ms. Blanton. You can complain to your supervisor. You can complain to your supervisor's supervisor. Or you can go to the president. It also says in that policy that the managers, every management-level supervisor, both the shift-level supervisors, the assistant managers are responsible for if they find out that there's discrimination, harassment in the workplace, they were told about it or they see it, they must report it up the chain of command. In your case, in the Williamson v. City of Houston case. But, I mean, as a practical matter, when you say report it up the chain of command, in this shop, they would have been reporting the harassment to the harasser. Isn't that right? It actually, I mean, they could have. Well, up the chain of command from Aguilar up the chain of command is Rosario, right? They could have reported it up, if they wanted to, to anybody else, I guess, within the company as well. If they could have reported it maybe to the person's area manager or the president or whoever. They have a responsibility to do so under the policy. So what would have prevented Mr. Blanton from reporting it then up the chain of command? Nothing would have prevented him from doing that except for the fact that he was absolutely told that if he did so, he'd probably get fired. But our point is, related to this particular case, is that in the Williamson v. City of Houston case, this court had already made a determination in 1999 that essentially . . . So are you saying he would have told someone else except he was fearful of being fired? Which, by the way, retaliation is a brand-new claim. But you're saying that's the reason he didn't tell anybody else. Right. Right. I mean, no, he basically . . . the point of the case is . . . And if that's a plausible argument, then wouldn't that explain Aguilar's not telling anybody else either? If everybody's afraid they're going to be fired if they tell, and it makes sense that he doesn't tell, then wouldn't it make sense for the rest of them not to tell? Well, yes, but the reality is that that goes directly to the issue of whether or not they have an effective policy in place to prevent sexual harassment or racial harassment to begin with, and whether or not he was reasonable in not reporting. That goes directly to the case law related to that particular issue, and that's their affirmative defense. They have a preponderance of evidence, so they have to have an effective policy in place. Well, let's get the names of the players correct because, as I understand it, Blanton did not report this to Rios until after it was discovered that Blanton had a suspended driver's license and therefore obviously could no longer be a driver for Pizza Hut, and he reported it to Rios. Is that the person to whom he made the formal report, to Rios? He did. After he came to the conclusion, the testimony was, after he came to the conclusion that essentially he didn't care anymore whether he got fired or not, he then said, I don't care. I'll go ahead and go to Rios. I'll take my punishment at that particular point in time. And Rios was the—what was Rios's title? Rios was a manager, general manager of one store, and also considered area manager, but he was not Ms. Rosario's direct manager. Her direct manager was actually, I guess, Mr. Richmond, the president. He was a sort of revolving consultant or supervisor for several stores in addition to being the general manager at one store. He was an auditor, basically. He audited the store to make sure that they were doing— So it was reported to Rios. Rios reported it up the chain to the president. The president fired the harasser within a week. Correct. So the only person that Blanton made a complaint to other than finally going to Rios was to Aguilar, who he just walked with her out into the parking lot after work one night and told her he was concerned about this, and she said, well, I'm not going to say anything because I'll lose my job. Well, she witnessed it day in and day out related to that, and she did tell him that. And she also reported to Ms. Ruiz, who also said something similar to that, that I'm afraid I'm going to lose my job and you'll probably lose your job as well. These are the two assistant managers of the store where he worked, Aguilar and Ruiz. Aguilar was an assistant manager. Ruiz was a shift manager. So in essence, the first determination, even under the new or should have known standard that was in place, if you don't even take into account the other further offense, which is usually for coworkers, the issue is later to notice, and this court has already made a determination in Williamson v. City of Houston where they stated if in your policy you designate someone as a person who can receive complaints of harassment or in your policy you designate people as someone who has to report those things, that is considered notice to the company upon informing those individuals. What was the passage of time between when he complained to Aguilar walking out in the parking lot one night and when the harasser was fired? What was the passage of time? I'm not sure exactly how many months that was, but remember, Your Honor, Aguilar and Ruiz saw the harassment during the entire time. What was the passage of time between when he first was harassed and when the harasser was fired? Not over a year. Over a year from the time that they witnessed the harassment. He worked there for almost two years, I believe, from the time that Ms. Rosario came on board, and during that time period, essentially, he was slowly harassed, and as both of these people testified, at first they thought it wasn't a problem. Then they realized it was, and they both stated they didn't know what to do. They didn't know how to handle the circumstances. Counsel, the upshot of your argument is that you're entitled to judgment, I guess, as a matter of law on this Ella Farga defense. Is that right? Well, we think even without the warrant, they didn't have a right to the Ella Farga defense because of the notice provisions in both Williamson as well as Sharp. City of Houston v. Sharp specifically stated that if you have a separate entity in and of itself that essentially is, in that case, a mounted patrol case, if you have that separate entity in and of itself, that if you allow that to go unchecked, the company should have done more and should have known that there's sexual harassment that did occur. When you're saying the notice provisions, they can't even raise the defense. Are you talking about the fact that it was raised so late? I'm sorry, Your Honor? I'm sorry. You said they can't even raise this defense because of the notice provisions, and I'm . . . No, no, no. That's the third argument. I'm sorry. You used the term notice provisions. I'm just trying to figure out what notice provisions you're talking about. I'm talking about the company being put on notice of the harassment to demonstrate that they have . . . You're not addressing your separate point about that it was improper to even allow this affirmative defense to be raised this late in the litigation. We made that argument, but my argument is mostly on the merits of the circumstance on the Ella Farga defense. And the fact is that you cannot have an effective policy. The case law shows that an effective policy is not just putting it in some document that has 37 pages. It's page 20 of that page. What you have to do is at least do some training on that aspect, and you have to make sure you train your managers and supervisors on what to do. Are you conceding? Are you abandoning your claim that this defense should not have been allowed to be raised this late in the litigation? No, I'm not abandoning that. No, I'm not abandoning that. What I'm saying is that . . . You're just not devoting any of your argument time to it. I'm not spending my time here today because I think my most important issues related to this is allow the court . . . Sometimes you can get . . . sometimes you can and should get a key from the panel's questions as what the panel thinks are the most important issues as opposed to what you walk through the door thinking . . . I'm not . . . . . . as opposed to, well, just, you know . . . So sometimes it's a tip-off. If you're getting asked about something a lot, that that may be it. But you haven't waited. It's in your briefing. But just, you know, word to the wise that sometimes that's a good tip to satisfy the query . . .  . . . that we have. Now one question from me with a declarative sentence, no commas in between response. You with me? Yes, Your Honor. All right. Now . . . You're not asserting that the policy that you assail was not provided or otherwise known to the employees including your client. We are asserting that they only provide the policy. No one received any training on policy at the whole pizza at number six. All right. Well, that's second. But first, it's not an issue that your client didn't know about the policy. I've got a follow-up, but I only want short answers. So, that's why I'm breaking it up. You're acknowledging there was the policy and that your client, whatever you're arguing about the defectiveness of it . . . . . . but your client, along with others, was aware of the policy as a part of him being an employee, right? My client testified, too, as he probably received the policy. He probably received it. He did not recall. How long had he worked there? A couple of years. All right. Well, there's no assertion in the pleadings that he didn't know, right? Am I correct to that? I think the only assertion was he went to orientation and I think they were probably signed off on it, so he probably got a copy. All right. Because, otherwise, you'd just be talking about he wasn't trained on something he didn't know about, which I don't think you are. All right. Then, the second piece is then, it's there. Then, you're in effect attacking the policy itself, vis-a-vis no training and all that. Is that . . . Yes, because the EEOC guidelines require there to be training on the policy. We also have precedent that shows that they have to do more than just hand you a policy. They have to train on the policy and they train their managers and supervisors on what to do when they're informed of this particular matter. All right. So, assuming an imperfect policy in terms of training, et cetera, assuming it's not the gold standard, connect the dot for me in terms of notice of the harassment to the owners, corporate heads, et cetera, and the immediate firing of the harasser. So, assuming the policy is imperfect, all the training, you know, it should have, could have happened, didn't, but undisputed fact that when the notice to the owners of it, person fired. So, how does the imperfect nature of the policy itself get you relief when even in its imperfect status, there's immediate termination? Do you follow my question? Why? Because the policy, the requirements of both Ellicott and Farragher and the requirements of other courts that have addressed this issue state specifically that a ploy has to be proactive in putting together a policy that's effective. The president of the company testified . . . But you're not answering my question. I want you to stay with me. I don't want you to make an argument. I want you to answer the question. I want you to listen. Don't answer the question you think I should ask you because I'm not being unfriendly. Don't answer the question you think I'm asking. Yes, I want you to listen to what I'm asking. I'm asking a given the policy is imperfect in the sense of your, in terms of training, et cetera, and all of that. I'm saying that given the undisputed fact here that per the policy when notice of the harassment goes to the owners, there's an immediate termination. I'm saying how does the imperfection of the policy in the abstract give you relief on the actual facts of the case that notice goes up and the person is fired? That's the part I'm not understanding. I understand your argument attacking the policy. They should have trained. They should have did all that. I just want to understand what's the connection you want us to make with that. There's only one element of the termination effect in the policy is what they actually did. A determination on the effect in the policy, you have to take into account what they actually do to prepare that individual who got harassed as well as the manager surrounding them. Termination is the ultimate remedy. We get lots of cases where they send somebody to sensitivity training. They do all this. But where the termination of the person in stanter, well. I understand what you're saying, Your Honor. But the point is if the person at the time that the harassment occurred, the policy needs to be put in place so everybody knows that if you make that report of harassment, nothing bad is going to happen to you and that we take these things seriously. So you're not seeking relief for your client vis-a-vis what happened here. You want some remedial relief from the panel in terms of what companies or other people ought to do in the industry itself in terms of training? No. I'm saying that the Ellis-Faragher affirmative defense is not available to the employer if they did not do at least some training on the policy of both the individual that was harassed as well as the managers and supervisors around them to let them know that if a general manager were to harass you. All right. Then my last question. And if that's back to where it's at. All right. What's the best case you have cited in your brief that supports the last point that you just made that Ellis-Faragher is not available where there's a defective policy or whatever? Now, you can look for it and when you come back up on rebuttal, just point me to the best case that makes the last point you're saying. In other words, whether or not withstanding they asserted your argument that if it's imperfect, they don't train, etc., that negates the ability to assert the defense. You follow me? Yes, Your Honor. So when you come back on rebuttal, just point me to the cases we'll look at. I just want to make sure I'm understanding the argument you're making beyond what you're saying. That's all. All right. Thank you for the answers to the questions. You've got some time for rebuttal. All right. Mr. McClenaghan. Thank you, Your Honor. After 30 years of practice, this is my first time here. I'm glad to be here. Watch out for the trap door that's there. Okay. Oh, well. First, Your Honors, I want to address the issue that was raised early on by Judge Barksdale, and that is the issue of the court having granted leave to Pete Hutt of San Antonio No. 6, Inc., to file an answer to include affirmative defenses once that party was added to the suit on the eve of trial. I think it's important to note that the defendants in this case, the original defendants, were Newton and Associates Limited and Richmond Enterprises, Inc., doing business as Pete's Hutt. We filed an answer on behalf of those two entities who were sued. In our original answer, we stated three times in that answer, the parties you have sued are not the employer. We are not liable in the capacity in which we have been sued. Three times in that original answer, which was on file for a year before trial. We talked about it in discovery as well, and that Pete's Hutt of San Antonio No. 6, Inc. was Mr. Blanton's employer. It was a separate entity organized under the laws of the state of Texas. It was the only entity that paid Mr. Blanton every one of his checks, said Pete's Hutt of San Antonio No. 6, Inc. They were separate corporations. In fairness, Newton and Associates and Richmond Enterprises provided services to Pete's Hutt of San Antonio No. 6, Inc. contractually. They provided some services in terms of buying a product so that they could do it more reasonably, more effectively, and more efficiently. They provided some personnel services. That is, when people were hired, they all went to the Newton and Associates office to fill out their paperwork, and they went back there to get their orientation and receive things such as the employee. I'm just trying to follow you now. Is all of this an explanation with regard to why a defendant was allowed to be brought in late, or are you talking about the corporate structure with regard to reporting of harassment? No, thank you, Your Honor, for that. No, this is to explain the relationship between the two, and that although Newton and Associates Limited and Richmond Enterprises, Inc. had interaction with Pete's Hutt of San Antonio No. 6, Inc., that was a separate entity, and we put the plaintiff on notice from day one from the time we filed our answer. It was not until right before trial that he attempted to amend his petition and bring in the employer, Pete's Hutt of San Antonio No. 6, Inc. We objected to that. The court allowed him, granted him leave to bring him in, but also granted Pete's Hutt of San Antonio No. 6, Inc. leave to file an answer and assert affirmative defenses. And the standard there would have to be, the plaintiff would have to show, the appellant in this case, would have to show that the court abused its discretion in allowing Pete's Hutt of San Antonio No. 6, Inc. to file an answer and assert those affirmative defenses. The trial occurs how long after the initial complaint was filed, roughly? It was after the initial complaint, about 13 months. The initial complaint, I think, was filed in November of 2012. The trial was December 2013. So we've got a year that rocks along with the wrong party. That's correct, Your Honor. So there was no preliminary discovery, requests for admissions, interrogatories, etc., etc., in terms of whittling all this out? There was written discovery, and again in that written discovery, we said, the parties you have sued are not the employer. All right. So at the time the judge gets it, he's confronted with the real party is now here, and a request to add him in by the plaintiff, which he grants. That's correct. Then on the other side of the ledger, he then allows the newly brought in party to assert the defense. That's correct. The court, having granted our request to file an answer and assert affirmative defenses, there was no need for us to seek a continuance, and the plaintiff did not seek one. Was there any entity other than number six that could have asserted the elegant, farragut affirmative defense? No, Your Honor. They were his employer, and so that was the only party that could have asserted the defense. That's why Newton & Associates or Richmond Enterprises did not assert the affirmative defense earlier. So once Pete's ahead of San Antonio was brought in, we asserted the affirmative defense, and that's where I'm going to transition into the affirmative defense. First of all, let me say that this is not a quid pro quo case. There's no allegation that it was quid pro quo, so in that case, the affirmative defense would not be available. In this case, it was a hostile environment complaint, that there was a hostile environment created for Mr. Blanton, and that was the gravamen of his complaint. The hostile environment, he claims, was created by the store manager of Pizza Hut of San Antonio, number six, Inc. I'm just going to refer to them as number six for brevity. It was created by the store manager, under whom he worked for a year and a half before raising the complaint. He worked for Pizza Hut about two years. He worked as a driver. Hold on. He says he complained to Aguilar and Ruiz. No. He talked to Aguilar and Ruiz as friends. In fact, Aguilar, in her testimony, said, well, he talked to me in the parking lot one night, but I was off the clock, and we were talking as friends. Patty Ruiz is someone that he had an intimate relationship with. That was his friend. He was not speaking to her as a supervisor or an assistant store manager, but as a friend. That's what Ms. Aguilar said when she heard the complaint, and what she told him was, and I think this is key, what she told him was, look, I don't want to make that complaint, but if you want to make the complaint, you need to make it to Eddie Rios, because he is Ms. Rosario's supervisor, which is exactly what the policy says, and that was two months, at least two months, she said in her testimony, before he actually made the complaint. He did not make that complaint, and I think this chronology is key. He claimed that he had been harassed for a year and a half. He did not make the complaint until . . . What about the fact that they witnessed the harassment? That didn't create some obligation to report it? Well, they may have had a moral obligation to do something about it, but . . . The policy doesn't . . . No, that's exactly right, and the policy really puts the burden on the person who is being harassed to make the report, and it says if you feel you are the subject of this harassment or object to this harassment, here's what you do. One of the following things, one or more of the following things, and Mr. Blanton seems to place a lot of emphasis on that. Before I go into what those were, let me . . . Let me ask you this. Yes, sir. Under the policy, assuming some validity to the feeling I'm not making a complaint because I might be fired, would the policy have embraced if all those persons who had witnessed it, including Blanton, collectively complained to Rios and or whoever else was up the chain? Was that the chain? I'm sorry. Well, I mean, you said the policy is such that it's up to the individual who's being harassed to make the complaint. I get that, but I also get, in the real world, the feeling of the other people. They're not complaining because they don't want to get fired, and even if they're complaining, they're people who absorb this because, you know, I need a job. And so I'm saying, without me having a policy up here in front of me, does the policy embrace that the end of . . . If they'd all say, well, our best strategy is for all ten of us to complain, they're not going to fire all ten of us for complaining about this since we all have witnessed it and can speak for . . . Or would it only be that unless Blanton himself made the complaint, would the company have acted? Yes, Your Honor. The policy does not preclude someone else who observes the offensive behavior from reporting it. Anyone can report it if they observe it. Well, in fact, it goes further than that. In Paragraph 3 of the policy, it says, should you experience or witness any form of discriminatory conduct or harassment, you should notify the director of operations, the office manager, so on and so forth. It doesn't say must. It says should. That's right. That's right. And I would say . . . You earlier said they had no obligation to report this. So are you saying using should instead of must means they had no obligation? Well, point was taken. I think the policy could be read that, yes, they should do that. Are they going to get in trouble if they don't do that? I don't see that in there. And I don't say . . . And I don't . . . I agree that the policy does not require them to do it. It does not say you must report this. I mean, it's not necessarily sponsored, but I've just got to tell you from my eyes, in 20 years sitting up here, I read a whole bunch of racial discrimination complaints. And this one here, in terms of the level of harassment, is up on the meter, as far as I'm concerned, in terms of the gravity, the level, the debasement of the harassment that's in the employment place, that's undisputed, and which the jury took a New York second to find. So it at least strikes me hard that within the workplace, the level and gravity of what's going on, not some subtle deal, I didn't hear it, I don't know anything about it. It's their biggest Dallas, but yet it's in the workplace, and yet there's a policy to which you rest on, to which there's no obligation for anybody to complain. It's up to the person until he's found, putting aside whether he waited too long and all that kind of stuff. But I just don't want you to leave the podium without at least knowing from this judge, that at least the gravity of it is such that it does make me wonder how that level of harassment can go on. But several people witnessed it, it's there, and yet there's nothing in the policy that gives rise to anybody, you know, well, it ain't me, it's him, you know, making the complaint. Now the policy on trial, as such, it only relates to, you know, to this defense. But just in trying to understand context, as you're helping us understand who the correct party was and so forth, it's just trying to help me fit in. I understand your concern, Justice Stewart, and I am not here to say that the behavior that was reported was not abhorrent and offensive, and we're not saying that at all. What we're focused on is did the jury, was the jury, as the fact finder, did it have evidence to support its finding that, one, that we had a reasonable policy, not a foolproof policy, but a reasonable policy in place to prevent and correct sexual or other harassment? The jury considered that and said yes, and let me point to some of the evidence. I agree. Who was Mr. Bland's supervisor? Well, the store manager. Who was? Ms. Rosario, the harasser. That's who he reported to. Well, so does the policy address, because I guess I'm assuming most scenarios would be that the harasser is other than the supervisor. So logically, obviously, if it's a coworker or somebody else, you report to the supervisor, which would have been Rosario, right? I mean, that might be the typical. So in the instance where the supervisor, the person who normally the complaint is made, is the actual harasser, does the policy speak to that as such? You follow what I'm saying? The policy speaks directly to that, and on page 20 of the handbook, it says, report the incident immediately to your manager or supervisor. If the person who you believe has violated this policy is your supervisor or manager, report the matter to that person's supervisor or manager. All right, my last question, I guess, is counsel obviously took I don't know how many minutes trying to explain or go over the hierarchy. You started your argument explaining to us the corporate hierarchy. So how in the world is a person dishing up pizza supposed to know and understand the corporate hierarchy of who to report to? In other words, this complicated scenario of who owns it, then you say Newton Associates, Richmond Associates provide some consulting work. So we got a lot going on here in terms of moving parts. So, you know, for even teeing it up as to who you report to, who owns it, who doesn't own it, then I see coming down the pipe, except for discovery, of getting up to trial without identifying who the real party is. So I guess my question is, policy say it must not. How do you know, how does the employee know who, you know, is the entity that you were playing? All right, so you go over the head of the supervisor because that's the harasser. How does the employee know under the policy who, not necessarily name, but entity, you report directly to? Do you follow my question? I do. They report directly, excuse me, the employees had information available in the store that said who you can report to. Secondly, and more importantly, Mr. Blanton knew Mr. Rios was the area manager who had this store in his area. He had personal knowledge. Can I ask you who Mr. Blanton's supervisor was? You told me Rosario, but didn't. That's correct. Well, but didn't Pizza Hut also admit that the shift managers and assistant managers were also in a supervisory position with regard to Mr. Blanton? Absolutely, absolutely. They were his supervisors. Well, they were his supervisors. Yes. All I'm saying is we know your policy said he should report the complaints to a supervisor. Isn't that what you thought? You just read it. He should report it to his supervisor. All right, and we have an admission in the record from Pizza Hut that supervisors included shift and assistant managers. Isn't that right? Yes, Your Honor, and I know exactly who. So why doesn't his report, and they're witnessing it, why isn't that sufficient that Pizza Hut was on notice of the racial and sexual harassment? Well, that's addressed in the Wyatt case, and what the Wyatt case says is that you must report it to a person who has the authority to act on it. And it was his supervisor. It was his supervisor who was the harasser. That's why the policy directs him. I mean, the store manager. The policy directs him to report that to her manager. Her subordinates were not her manager, and so if he had followed the policy, and, in fact, Mr. Blanton says in his testimony he agrees, admits that if he had read, which he said he did not do, if he had read the policy, which also he represented to Pizza Hut that he had read it, said he had not read it, but he admitted in testimony that had he read the policy and had he followed it, he could have reported to Mr. Rios at any time and put an end to it. He opted not to, and that's one of the things, that's the second prong of the affirmative defense that the jury had to consider. That was, was he unreasonable in failing to report it to put an end to the harassment? And the jury considered that, and they came back and answered yes, that he was unreasonable in failing to report it. When he did report it, we know that the results were an instant termination of a 20-year employee. That was Ms. Rosario. She worked there for 20 years, and she was fired like that when this complaint arose. And when it was brought to Mr. Richman's attention. Mr. Richman was president of Newton Associates, Inc. Mr. Richman was president of, also president of Pizza Hut of San Antonio No. 6, Inc. Well, in your brief at page 7, you only identify him as president of Newton Associates, Inc., but you're telling us he's providing record evidence that he's also president of Pizza Hut No. 6? That's correct, Your Honor. And so, again, the question is, do we disregard the jury? And the cases are replete. We could stand up here all morning and talk about cases that stand for the proposition that the jury's weighing of the testimony and their decision, as long as it is a reasonable decision, will not be disturbed by the court. Even if the court were to believe that there might have been a more reasonable interpretation of the evidence, the jury heard the evidence, they answered the questions, and they answered, one, that there was harassment, and secondly, that we met both prongs of the affirmative defense, and there's no rule of law or case that would cause this court to overturn that jury's decision. There was ample evidence. The existence of a written policy, oh, let me mention one other thing. Mr. Blanton's attorney said, well, what was required by law is that they do training. No, that's not required by law. There's not a single case that says, unless you do training of every employee, you're liable. There's not one case out there that we could find that says, in fact, what the cases say is you don't necessarily have to have a written policy. It's helpful. You need to have a written policy. And they go the other way, too. They say, just because you have a written policy doesn't mean that you have met your burden, but that's also some evidence. So we believe that the jury's verdict should stand and the case should be affirmed. All right, quick question. Yes, sir. You mentioned you said there was other information in the store that tells employees what to do, report to, blah, blah, blah. What's the identification of that? Is that something like on a wall, a placard? Yes, and it gave Mrs. Snow, Linda Snow's phone number and Mr. Richmond's phone number. Who's Linda Snow? Linda Snow was a witness. She provides human resources services. That's the HR person? Yes. All right. So, I mean, that's like, you know, sometimes in stores or whatever, they have a sign about wage and hour violations or whatever, whatever. By the clock. All right, so that's what it says if you have X, some kind of violation and all that. That's correct. And was there testimony about that in the record? Or is that what you're saying, Mr. Blandon, admitted to? It was along that line of knowing from that source? Mrs. Snow gave testimony about that. Okay. All right. Thank you, sir. Thank you, Your Honor. All right. Mr. Lee, you've got five minutes for rebuttal. Thank you, Your Honor. You asked me a question specifically about what cases I think are important. I think the first case, I looked to a Sixth Circuit case, Clark v. UPS. What's the name? Clark v. UPS. It's 400 F. 3rd, 341. And on page 349 of that, it talks about specifically what is important relating to these matters. It says an effective policy must require supervisors to report and provide training on the policy. Specifically, those are two of the four criteria that they said that you have to be able to meet to have an effective policy. Now, doesn't Clark also stand for the proposition that that's a fact inquiry, which is appropriately submitted to the jury? Isn't that what it is? I do not believe that that's the case, Your Honor. I believe it says if you can't even at least meet that criteria as a matter of law, you don't do that. I mean, Farragher itself overturned as a matter of law in that case, in the Supreme Court case. It said specifically in that case that there was not enough to demonstrate there's an effective policy. Isn't the evidence here that he attended a training session and he signed that he had received and read the policy? No, he attended an orientation session where he filled out all his W-2 paperwork and signed. Only one of us can talk at a time, and I'm the one talking. Yes, Your Honor. So he attended an orientation session. At the end of that orientation session, he signed that he had received and read the policy. Yes. All right. Thank you. Which almost every employee in America does nowadays, but that does not demonstrate that that's an effective policy. And you've got record evidence to support that? Or is this just you all? No, there's nothing in the record, Your Honor. I apologize. The Fifth Circuit suggested just last year in EEOC v. Bowe Brothers, 731 F. 3rd, 444, they rejected the affirmative defense because the company did not provide guidance on the supervisors on guidance to supervisors on how to handle sexual harassment complaints. The EEOC regulations, specifically 29 CFR 160411 F, says an effective program should include an explicit policy against sexual harassment as clearly and regularly communicated to employees and effectively implemented. All those things require more than just policy. And I don't disagree with counsel when he says it doesn't have to be in writing. If you come in with your people and you're explaining this is the way we handle things here, it doesn't have to be in writing, but you have to make sure that your managers and supervisors and employees know that we take this seriously. We're not going to allow any manager above you to do this to you. All right. Counsel opposite said at the end of his argument that Mr. Blanton made some admissions of, you know, what he knew or he should have done something, and I didn't write it all down. So putting a period in what you're saying about the policy, what do you do about that? I mean, is your client acknowledged on the stand or otherwise what counsel opposite said he knew about who to report to, et cetera? I think it's a red herring on whether or not they have an effective policy or not. It's a red herring on the issue of whether or not they had proper procedures or not. It's a red herring on whether he was unreasonable or not on the circumstances. Well, let's just go this way. We got your argument on opening and now in terms of what your view of the policy is, okay? We got it. And so you haven't abandoned that, but we're trying to get to if we disagree with you in terms of this went to the jury, whether it was reasonable for the jury to determine what it did. That's where we are in the inquiry now. So part of impacting that is to unpack, you know, what other information. So I'm just asking you succinctly. Counsel opposite said notwithstanding, you haven't abandoned the argument about the policy, but whether within that did the jury hear from your client saying that, well, yes, I knew or I otherwise knew, blah, blah, blah. I'm just trying to get your response to that statement. I think my client said when I questioned him on the issues of the policy, he said, I guess if I had known and really understood that, I would have gone ahead and done that. So you're saying that. I believe that's what he said, but I can't recall. The sentence brief at page 7, about two-thirds of the way down the page, says, Blanton did admit during his testimony that had, in italics, he read the handbook, he would have known exactly what to do with regard to reporting his problem. And it cites the record at 887-888. Are you saying that that is not what he testified to? I don't recall if he's accepted to. I'm not going to say that they're improper, but the reality is it still doesn't change the fact that he may have known who to report to, but it doesn't change the fact that he didn't know if he did report it, he would end up being let go. That is extremely important testimony, and we expect counsel to know the record. I'm surprised you can't answer my question. I'm sorry, Judge Warksdale, but I don't remember the exact . . . Look, your light's on, but I'm going to give you a summation sentence. I mean, we asked you a question and threw you out. I mean, we got the policy, but just leave us with . . . If the key issue is that the judge shouldn't have let the jury hear it or whatever, just tell them that in a declarative sentence before you leave the program. Are you with me? The key issue is the judge shouldn't have allowed this elepharic offense because specifically there's no doubt that they did not have an effective policy, and this court has to make a determination for all employers moving forward on whether or not just handing somebody a handbook at orientation is enough to make an effective policy. Under the circumstances, especially when all the assistant managers, shift leaders, and everybody at that store knew about it, and somehow also find that it was not appropriate for my client not to report it, given the fact that he was told by the assistant manager and the shift leader that if he reported it, he'd probably get fired. All right. All right, Mr. Lee, thank you for your argument. We appreciate your passion on behalf of your client.